UNITED STATES DISTRICT COURT
DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>THE MUNICIPALITY OF SAN JUAN,<br>THE PUERTO RICO DEPARTMENT OF<br>NATURAL AND ENVIRONMENTAL<br>RESOURCES, THE PUERTO RICO<br>DEPARTMENT OF TRANSPORTATION<br>AND PUBLIC WORKS, and THE<br>COMMONWEALTH OF PUERTO RICO,<br><br>Defendants. | CIVIL ACTION NO. |

## COMPLAINT

The United States of America ("United States"), by the authority of the Attorney General

of the United States, acting on behalf of the Administrator of the United States Environmental

Protection Agency ("EPA"), alleges as follows:

## NATURE OF THE ACTION

1.     This civil action is brought against the Municipality of San Juan, Puerto Rico

("San Juan") pursuant to Sections 309(b) and (d) of the Clean Water Act ("Act"), 33 U.S.C. §§

1319(b) and (d), for injunctive relief and civil penalties for unauthorized, illegal and persistent

discharges of pollutants in violation of Section 301 of the Act, 33 U.S.C. § 1311, and violations

of the November 6, 2006 National Pollution Discharge Elimination System General Permit for

Discharges from Small Municipal Separate Storm Sewer Systems ("MS4 General Permit").  A

true and correct copy of the MS4 General Permit is attached hereto as Exhibit 1.

2.     This civil action is brought against the Puerto Rico Department of Natural and

Environmental Resources ("DNER"), pursuant to Sections 309(b) and (d) of the Clean Water Act

("Act"), 33 U.S.C. §§ 1319(b) and (d), for injunctive relief and civil penalties for unauthorized,

illegal and persistent discharges of pollutants in violation of Section 301 of the Act.

3.     This civil action is brought against the Puerto Rico Department of Transportation

and Public Works ("DTPW") pursuant to Sections 309(b) and (d) of the Clean Water Act

("Act"), 33 U.S.C. §§ 1319(b) and (d), for injunctive relief and civil penalties for unauthorized,

illegal and persistent discharges of pollutants in violation of Section 301 of the Act, 33 U.S.C. §

1311, and violations of the MS4 General Permit attached as Exhibit 1.

4.     This civil action is also brought against Defendants pursuant to Section 504 of the

Act, 33 U.S.C. § 1364, to require Defendants to take such action as may be necessary to abate

the imminent and substantial endangerment to the health and welfare of persons presented by the

Defendants' discharges of pollutants.

5.     Based upon observations and results of sampling, Defendants have created and

maintained an imminent and substantial endangerment to human health or welfare and

Defendants have also violated the Act in a number of ways, including, but not limited to: San

Juan's violation of its MS4 General Permit requirements, including discharging unpermitted non-

storm water to waters of the United States and failing to fully implement an adequate Storm

Water Management Program by November 6, 2011; DNER's unpermitted discharges of

pollutants from at least three of its pump stations; and DTPW's violation of its MS4 General

Permit requirements, including discharging unpermitted non-storm water to waters of the United States.

## JURISDICTION, AUTHORITY, AND VENUE

6.   This Court has jurisdiction over the subject matter of this action and the parties pursuant to Sections 309(b), (d), and/or 504(a) of the Act, 33 U.S.C. §§ 1319(b), (d), and/or 1364(a), and pursuant to 28 U.S.C. §§ 1331, 1345 and 1355.

7.   Venue is proper in this judicial district pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b), and 28 U.S.C. §§ 1391(b) and 1395.

8.   Notice of the commencement of this action has been given to the Commonwealth of Puerto Rico pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b).

## PLAINTIFF

9.   Plaintiff is the United States of America, acting by the authority of the Attorney General and on behalf of the Administrator of the EPA.

## DEFENDANTS

10.   Defendant San Juan is a "municipality" within the meaning of Section 502(4) of the Act, 33 U.S.C. § 1362(4).

11.   San Juan is a "person" within the meaning of Section 502(5) of the Act, 33 U.S.C. § 1362(5) because it is a "municipality."

12.   San Juan owns and/or operates a Municipal Separate Storm Sewer System ("MS4") in the Municipality of San Juan.

13.   Defendant DNER is an executive department of the Commonwealth of Puerto Rico ("Puerto Rico") under the Laws of Puerto Rico, P.R. Ann., Title 3, § 152.

3

14.     DNER is a "person" within the meaning of Section 502(5) of the Act, 33 U.S.C. § 1362(5).

15.     DNER owns and/or operates several storm water pump stations in Puerto Rico, including the Baldorioty de Castro, De Diego and Stop 18 pump stations, as described in greater detail below.

16.     Defendant DTPW is an executive department of Puerto Rico under the Laws of Puerto Rico, P.R. Ann., Title 3, § 411.

17.     DTPW is a "person" within the meaning of Section 502(5) of the Act, 33 U.S.C. § 1362(5).

18.     DTPW owns and/or operates an MS4 with certain functions performed by and through subsidiary agencies, authorities or directorates, including but not limited to the Highway and Transportation Authority and the Public Works Directorate.

19.     Portions of DTPW's MS4 are located within the municipal boundaries of San Juan, including but not limited to those sewers servicing Puerto Rico State Roads PR-25, PR-26, and PR-37.

20.     Section 309(e) of the Act, 33 U.S.C. § 1319(e), provides:

Whenever a municipality is a party to a civil action brought by the United States under this section, the State in which such municipality is located shall be joined as a party. Such State shall be liable for payment of any judgment or any expenses incurred as a result of complying with any such judgment entered against the municipality in such action, to the extent that the laws of that State prevent the municipality from raising revenues needed to comply with such judgment.

21.    Puerto Rico is a "State" for the purposes of Section 502(3) of the Act, 33 U.S.C. §1362(3).

22.    Puerto Rico is joined in this action pursuant to Section 309(e) of the Act, 33 U.S.C. § 1319(e) and because DNER and DTPW are instrumentalities of Puerto Rico.

## STATUTORY AND REGULATORY BACKGROUND

23.    Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutants into navigable waters of the United States by any person except in compliance with the requirements of that section, including as authorized by and in compliance with a National Pollutant Discharge Elimination System ("NPDES") permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

24.    Section 502(12) of the Act, 33 U.S.C. § 1362(12), defines the term "discharge of a pollutant" to mean, among other things, "any addition of any pollutant to navigable waters from any point source . . . ."

25.    Section 502(5) of the Act, 33 U.S.C. § 1362(5), defines the term "person" as: "an individual, corporation, partnership, association, State, municipality, commission, or political subdivision of a State or any interstate body."

26.    Section 502(6) of the Act, 33 U.S.C. § 1362(6), defines the term "pollutant" to include sewage, biological materials, and municipal waste.

27.    Section 502(7) of the Act, 33 U.S.C. § 1362(7), defines the term "navigable waters" to be "waters of the United States, including its territorial seas." EPA regulations

promulgated pursuant to the Act define the term "waters of the United States" to include, among other things: (1) all waters which are currently used, were used in the past, or may be susceptible to use in interstate or foreign commerce, including all waters which are subject to the ebb and flow of the tide; (2) all interstate waters; (3) all other waters such as intrastate lakes, rivers and streams (including intermittent streams), the use, degradation, or destruction of which would affect or could affect interstate or foreign commerce; (4) tributaries of waters of the United States; and (5) certain wetlands (including wetlands adjacent to these waters). 40 C.F.R. § 122.2.

28. Section 502(14) of the Act, 33 U.S.C. § 1362(14), defines the term "point source" as "any discernible, confined and discrete conveyance, including, but not limited to, any pipe, ditch, channel, tunnel, conduit, well, or discrete fissure from which pollutants may be discharged."

29. Under Section 402(a) of the Act, 33 U.S.C. § 1342(a), the Administrator of the EPA ("Administrator") may issue a NPDES permit that authorizes the discharge of pollutants into waters of the United States, provided that all discharges meet the applicable requirements of Section 301 of the Act, 33 U.S.C. § 1311, or such other conditions as the Administrator determines are necessary to carry out the provisions of the Act.

30. Section 402(p) of the Act, 33 U.S.C. § 1342(p), sets forth the requirements for the discharge of storm water, including discharges of storm water from MS4s.

31. 40 C.F.R. §122.26(b)(8), defines an MS4 as a "conveyance or system of conveyances (including roads with drainage systems, municipal streets, catch basins, curbs, gutters, ditches, man-made channels, or storm drains): (i) owned or operated by a city, town, borough, county, parish, district, association, or other public body (created by State law) . . . that discharges into waters of the United States; (ii) designed or used for collecting or conveying

storm water; (iii) which is not a combined sewer; and (iv) which is not part of a Publicly Owned

Treatment Works. . ."

32.     40 C.F.R. § 122.26(b)(16)(ii) defines a "small municipal separate storm sewer

system," in part, as "not defined as 'large' or 'medium' municipal separate storm sewer systems

pursuant to paragraphs (b)(4) and (b)(7) of this section, or designated under paragraph (a)(1)(v)

of this section."

33.     Pursuant to 40 C.F.R. § 122.32(a)(1), all small MS4s located in an "urbanized

area" (as determined by the latest Decennial Census by the Bureau of Census) are regulated

small MS4s.  40 C.F.R. § 122.33(a) and (b) require operators of regulated small MS4s to seek

authorization to discharge under the applicable NPDES general permit issued by the permitting

authority, by submitting a notice of intent for coverage under such permit.

34.     Section 309(b) of the Act, 33 U.S.C. § 1319(b), authorizes the Administrator to

commence a civil action for appropriate relief, including a permanent or temporary injunction

when any person violates, among other things, Section 301, 33 U.S.C. § 1311, or violates any of

the terms or conditions of an NPDES permit, issued pursuant to Section 402 of the Act, 33

U.S.C. § 1342.

35.     Section 309(d) of the Act, 33 U.S.C. § 1319(d), provides that any person who

violates, among other things, Section 301 of the Act, 33 U.S.C. § 1311 or violates any of the

terms or conditions of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. §

1342, shall be subject to a civil penalty not to exceed $25,000 per day for each violation.

36.     Pursuant to the Federal Civil Penalties Inflation Adjustment Act of 1990 (28

U.S.C. § 2641 note: Pub. L. 101-410, enacted October 5, 1990; 104 Stat. 890), as amended by

the Debt Collection Improvements Act of 1996 (31 U.S.C. § 3701 note: Pub. L. 101-134, enacted

April 26, 1996, 110 Stat. 1321), EPA promulgated the Civil Monetary Penalty Inflation

Adjustment Rule.  Under that rule, EPA may seek civil penalties of up to $32,500 per day for

each violation occurring after March 15, 2004 through January 12, 2009, up to $37,500 per day

for each violation occurring after January 12, 2009 through December 6, 2013, and up to

$37,500 per day for each violation occurring after December 6, 2013.  See 61 Fed. Reg. 69,364

(Dec. 31, 1996); 69 Fed. Reg. 7,121 (Feb. 13, 2004); 73 Fed. Reg. 73,345 (Dec. 11, 2008); 78

Fed. Reg. 66,643 (Nov. 6, 2013).

    37.    Section 504(a) of the Act, 33 U.S.C. § 1364(a), authorizes the Administrator to

commence a civil action for injunctive relief upon receipt of evidence that a pollution source or

combination of sources is presenting an imminent and substantial endangerment to the health or

welfare of persons.

## GENERAL ALLEGATIONS

    38.    On or about September 2, 2006, pursuant to Section 402 of the Act, 33 U.S.C. §

1342, EPA issued the NPDES General Permit for Discharges from Small MS4s, effective

November 6, 2006 ("MS4 General Permit").

    39.    Under Section 6.2 of the MS4 General Permit, the permit expired on November 6,

2011, but remains in full force and effect because EPA has not replaced or re-issued it or

determined that it will not be replaced or reissued.

    40.    Under Section 1.5.1 of the MS4 General Permit, all regulated small MS4s must

submit a notice of intent to be covered under the permit, or to apply for an individual permit by

February 5, 2007.

*Municipality of San Juan's System*

41.     San Juan owns and operates a small MS4 in Puerto Rico that flows into various bodies of water including bodies of water within and comprising the San Juan Bay Estuary.

42.     The San Juan Bay Estuary is a federally-identified national estuary under Clean Water Act Section 320, 33 U.S.C. § 1330, indicating that it has been recognized as an estuary of national significance and is subject to comprehensive conservation management.

43.     San Juan's MS4 includes but is not limited to the Barrio Obrero Pump Station; storm sewers on Calle 10 and Calle 13 south of Avenida Rexach; the Buena Vista Santurce Pump Station ("Buena Vista Pump Station"); storm sewers that discharge to the Puerto Nuevo Channel, the Martín Peña Channel, San Jose Lagoon, Buena Vista Creek, and the Rio Piedras River; and storm sewers tributary to the DNER Baldorioty de Castro Pump Station, storm sewers tributary to the DNER Stop 18 Pump Station, and storm sewers tributary to the DNER De Diego Pump Station.

44.     San Juan's MS4 is intended to convey storm water runoff to surface waters to prevent flooding during wet weather events.

45.     San Juan's MS4 is a regulated small MS4 pursuant to 40 C.F.R. § 122.32(a)(1).

46.     San Juan submitted its notice of intent to have discharges from its MS4 covered under the MS4 General Permit on March 7, 2008.

47.     The MS4 General Permit at Sections 1.3.1 and 1.4 does not authorize San Juan to discharge non-storm water from its MS4 unless the non-storm water discharges are among particular exceptions listed in the MS4 General Permit, including landscape irrigation, diverted stream flow, groundwater, dechlorinated swimming pool discharges, and street wash water.

*DTPW's System*

48.     DTPW owns and operates a small MS4 in Puerto Rico a portion of which flows into San Juan's MS4 storm sewers and/or DNER pump stations, which ultimately discharge to various bodies of water including bodies of water within and comprising the San Juan Bay Estuary.

49.     DTPW's MS4 includes storm sewers constructed and operated as part of transportation related infrastructure in Puerto Rico, including but not limited to storm sewers that service the Baldorioty de Castro Expressway (PR-26) (formerly known as the North Expressway), De Diego Avenue (PR-37), and Ponce de León Avenue (PR-25), storm sewers tributary to the DNER Baldorioty de Castro Pump Station, storm sewers tributary to the DNER Stop 18 Pump Station (also known as Barriada Figueroa Pump Station), and storm sewers tributary to the DNER De Diego Pump Station.

50.     DTPW's MS4 is intended to convey storm water runoff to surface waters to prevent flooding during wet weather events.

51.     DTPW's MS4 is a regulated small MS4 pursuant to 40 C.F.R. § 122.32(a)(1).

52.     DTPW submitted its notice of intent to have discharges from its MS4 covered under the MS4 General Permit on November 4, 2011.

53.     The MS4 General Permit at Sections 1.3.1 and 1.4 does not authorize DTPW to discharge non-storm water from its MS4 unless the non-storm water discharges are among particular exceptions listed in the MS4 General Permit, including landscape irrigation, diverted stream flow, groundwater, dechlorinated swimming pool discharges, and street wash water.

### DNER's System

54.    DNER owns and operates several storm water pump stations in Puerto Rico, including the Baldorioty de Castro Pump Station, the De Diego Pump Station, and the Stop 18 Pump Station.

55.    The Baldorioty de Castro, De Diego, and Stop 18 Pump Stations discharge all flow entering the pump stations without treatment for pollutants; bar screens in the pump stations remove large debris and solids only to reduce the risk of damage to the pumps; sorbent booms in the pump stations remove some floatables and sheens when properly operated and maintained.

56.    DNER's discharge of pollutants from its storm water pump stations is not covered under any NPDES permit.

### Studies

57.    In August 2006, Science Applications International Corporation ("SAIC") provided support to EPA by conducting sampling at several storm water pump stations (the "August 2006 Sampling Inspection").

58.    In August 2008, SAIC  provided support to EPA by conducting sampling at various locations within the Municipality of San Juan, including San Juan's MS4 and DTPW's MS4 (the "August 2008 Sampling Inspection").

59.    In December 2009, CSA Architects and Engineers, LLP issued a final report of a flood control study to San Juan entitled, "Estudio del Problema de Inundaciones en el Municipio de San Juan, Puerto Rico" ("CSA Report").

60.    In March and April 2011, Eastern Research Group, Inc. ("ERG") provided support to EPA, including, but not limited to, conducting sampling at various locations within the Municipality of San Juan and receiving waters (the "March 2011 Sampling Event").

61.     In June 2011, EPA conducted a Reconnaissance Inspection of San Juan's Barrio Obrero and Buena Vista Pump Stations (the "June 2011 Reconnaissance Inspection").

62.     In February, March and April 2012, EPA conducted Reconnaissance Inspections of portions of the Juan Méndez Creek and the DNER Baldorioty de Castro Pump Station drainage area, Monroig Avenue, Buena Vista Creek, Rio Piedras River, San Antón Creek, Puerto Nuevo Channel, and Doña Ana Creek watersheds (the "Spring 2012 Reconnaissance Inspections").

63.     In April and May 2012, DNER conducted sampling at the De Diego, Baldorioty de Castro, and Stop 18 Pump Stations at the United States' request and provided the results to EPA (the "May 2012 DNER Sampling Event").

64.     In June, July, August, and October 2012, EPA conducted Reconnaissance Inspections of portions of the Rio Piedras River, Doña Ana Creek, San Antón Creek, Juan Méndez Creek, Puerto Nuevo Channel, Sabana Llana Creek, Josefina Creek, Mongil Creek, Del Ausubo Creek, Buena Vista Creek, and the DNER De Diego Pump Station watersheds (the "Summer/Fall 2012 Reconnaissance Inspections").

65.     Between October 2012 and August 2013, San Juan conducted sampling events at various outfalls in the San Juan municipal area, including but not limited to San Juan's Buena Vista Pump Station, storm sewers outfalls to the Martin Peña Channel at Calle 10, Calle 13 and the Barrio Obrero Pump Station (the "2012 San Juan Sampling Events")

66.     In December 2012, DNER conducted sampling events at three DNER pump stations (the "December 2012 DNER Sampling Event")

67.     In April, July, and September 2013, EPA conducted Reconnaissance Inspections of storm sewers in and around the Condado watershed and of storm sewers along the Baldorioty

de Castro Expressway (PR-26) and De Diego Avenue (PR-37) and the Stop 18 Pump Station (the "2013 Reconnaissance Inspections").

*Affected Waters*

68.    Martín Peña Channel is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

69.    Los Corozos Lagoon is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

70.    The Puerto Nuevo Channel is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

71.    The Rio Piedras River is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

72.    The Buena Vista Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

73.    The Sabana Llana Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

74.    The Doña Ana Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

75.    The Mongil Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

76.    The Del Ausubo Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

77.    The Josefina Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

78.     The San Antón Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

79.     The San Jose Lagoon is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

80.     The Buena Vista Creek is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

81.     The San Juan Bay is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

82.     The Atlantic Ocean is a "navigable water" within the meaning of Section 502(7) of the Act, 33 U.S.C. § 1362(7).

### *San Juan's Unpermitted Discharges of Non-Storm Water from the Barrio Obrero Pump Station*

83.     San Juan owns and operates an MS4 including, but not limited to, the Barrio Obrero Pump Station, located on Avenida Rexach between Calle Valparaiso and Avenida Barbosa.

84.     San Juan discharges flow entering the Barrio Obrero Pump Station into the Martín Peña Channel without treatment for pollutants; bar screens in the pump station remove large debris and solids only to reduce the risk of damage to the pumps.

85.     The August 2008 Sampling Inspection established the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in influent entering the Barrio Obrero Pump Station.

86.     Based on sampled levels of ammonia, surfactants, and fecal bacteria, and the measured biological oxygen demand, the August 2008 Sampling Inspection established that San

Juan was discharging untreated industrial and/or domestic wastewater ("raw sewage") from the Barrio Obrero Pump Station.

87.     The June 2011 Reconnaissance Inspection confirmed the continued presence of wastewater in the Barrio Obrero Pump Station influent and discharge.

88.     Sampling conducted between October 2012 and August 2013 confirmed the presence of pollutants, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing to the Barrio Obrero Pump Station which ultimately flows into the Martín Peña Channel.

89.     The discharge pipe or outfall of the Barrio Obrero Pump Station is a "point source" within the meaning of Section 504(14) of the Act, 33 U.S.C. §1362(14), because it is a discernible, confined and discrete conveyance from which pollutants are or may be discharged.

90.     Based on sampling and inspections, San Juan has discharged non-allowable wastewater from the Barrio Obrero Pump Station into waters of the United States.

### San Juan's Unpermitted Discharges of Non-Storm Water from the Buena Vista Pump Station

91.     San Juan owns and operates an MS4 including, but not limited to, the Buena Vista Pump Station, located on Calle 2 where it intersects with the Martín Peña Channel.

92.     San Juan discharges flow entering the Buena Vista Pump Station into the Martín Peña Channel without treatment for pollutants, by operating a portable pump to the Buena Vista Pump Station during flood events.

93.     The June 2011 Reconnaissance Inspection confirmed the presence of sewage in the Buena Vista Pump Station.

94.     Sampling conducted in October 2012 confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the wet pit of the Buena Vista Pump Station.

95.     The discharge pipe or outfall of the Buena Vista Pump Station is a "point source" within the meaning of Section 504(14) of the Act, 33 U.S.C. §1362(14), because it is a discernible, confined and discrete conveyance from which pollutants are or may be discharged.

96.     Based on sampling and inspections, San Juan has discharged non-allowable wastewater from the Buena Vista Pump Station to waters of the United States.

### San Juan's Unpermitted Discharges of Non-Storm Water from the Calle 10 and 13 Outfalls

97.     San Juan owns and operates an MS4 including, but not limited to, storm sewers on both sides of Calle 10 and Calle 13 that discharge via gravity into the Martín Peña Channel.

98.     The storm sewers on Calle 10 and Calle 13 were designed to prevent flooding by collecting storm water and conveying it to the Martín Peña Channel.

99.     Other than the Vacuum Sewer, and prior to its installation, there are no sanitary sewers to collect sanitary wastewater from certain homes along Calle 10 and Calle 13 south of Rexach Avenue, and these residences discharge sewage directly to San Juan's MS4.

100.    The March 2011 Sampling Event established the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharges from the Calle 10 and Calle 13 storm sewer outfalls.

101.    Sampling between October 2012 and August 2013 confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the Calle 10 and Calle 13 outfalls.

102.    The discharge pipe or outfall at the end of Calle 10 and/or at the end of Calle 13 are "point source[s]" within the meaning of Section 504(14) of the Act, 33 U.S.C. §1362(14), because they are discernible, confined and discrete conveyances from which pollutants are or may be discharged.

103.    Based on sampling and inspections, San Juan has discharged non-allowable wastewater from the Calle 10 and Calle 13 outfalls to waters of the United States.

### San Juan's Unpermitted Discharges of Non-Storm Water to San José Lagoon and the Rio Piedras River/Puerto Nuevo Channel

104.    San Juan owns and operates an MS4 including, but not limited to, storm sewers discharging to tributaries flowing to the San José Lagoon and into the Rio Piedras River and Puerto Nuevo Channel and San Juan Bay including, but not limited to, the Doña Ana Creek, San Antón Creek, Juan Méndez Creek, Sabana Llana Creek, Josefina Creek, Mongil Creek, Del Ausubo Creek, and the Buena Vista Creek.

105.    The storm sewers investigated in the Spring 2012 Reconnaissance Inspections and the Summer/Fall 2012 Reconnaissance Inspections ("2012 San José Lagoon/Rio Piedras River Study Areas") were designed to prevent flooding by collecting storm water and conveying it to receiving waters and ultimately San Juan Bay.

106.    The Spring 2012 Reconnaissance Inspection and the Summer/Fall 2012 Reconnaissance Inspections confirmed the continued presence of raw sewage in the discharges from San Juan's MS4 system in the 2012 San José Lagoon/Rio Piedras River Study Area.

107.    The discharge pipes or outfalls discharging from San Juan's storm sewers within the 2012 San José Lagoon/Rio Piedras River Study Area are "point source[s]" within the meaning of Section 504(14) of the Act, 33 U.S.C. §1362(14), because they are discernible, confined and discrete conveyances from which pollutants are or may be discharged.

17

108.   Based on inspections, San Juan has discharged non-allowable wastewater from its MS4 into waters of the United States, including the San José Lagoon, the Rio Piedras River/Puerto Nuevo Channel, and San Juan Bay.

### San Juan's Unpermitted Discharges of Non-Storm Water through the Baldorioty de Castro Pump Station

109.   A portion of San Juan's MS4 conveys flow into the Baldorioty de Castro Pump Station.

110.   San Juan's flow to the Baldorioty de Castro Pump Station is discharged without treatment for pollutants to the Los Corozos Lagoon; bar screens in the pump stations remove large debris and solids only to reduce the risk of damage to the pumps; sorbent booms in the pump stations remove some floatables and sheens when properly operated and maintained.

111.   The August 2008 Sampling Inspection established the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in a portion of San Juan's MS4 conveying flow to the Baldorioty de Castro Pump Station.

112.   The March 2011 Sampling Event established the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharges from the Baldorioty de Castro Pump Station.

113.   The February 2012 Reconnaissance Inspection identified the presence of sewage indicator(s), using field tests, in a portion of San Juan's MS4 that conveys flow into the Baldorioty de Castro Pump Station.

114.   The May 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Baldorioty de Castro Pump Station.

115.    The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Baldorioty de Castro Pump Station.

116.    The discharge pipe channel or outfall of the Baldorioty de Castro Pump Station is a "point source" within the meaning of Section 504(14) of the Act, 33 U.S.C. §1362(14), because it is a discernible, confined and discrete conveyance from which pollutants are or may be discharged.

117.    Based on sampling and inspections, San Juan has discharged non-allowable wastewater through the Baldorioty de Castro Pump Station to waters of the United States.

### San Juan's Unpermitted Discharges of Non-Storm Water through the De Diego Pump Station

118.    A portion of San Juan's MS4 conveys flow into the De Diego Pump Station.

119.    San Juan's flow to the De Diego Pump Station is discharged without treatment for pollutants to Condado Beach where it flows into the Atlantic Ocean; bar screens in the pump stations remove large debris and solids only to reduce the risk of damage to the pumps; sorbent booms in the pump stations remove some floatables and sheens when properly operated and maintained.

120.    The August 2008 Sampling Inspection established the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in a portion of San Juan's MS4 conveying flow to the De Diego Pump Station.

121.    The March 2011 Sampling Event established the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharges from the De Diego Pump Station.

122.    The May 2012 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the De Diego Pump Station.

123.    The June 2012 Reconnaissance Inspection confirmed the continued presence of sewage in a portion of San Juan's MS4 that conveys flow into the De Diego Pump Station.

124.    The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the De Diego Pump Station.

125.    The discharge pipe or outfall of the De Diego Pump Station is a "point source" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), because it is a discernible, confined and discrete conveyance from which pollutants are or may be discharged.

126.    San Juan has discharged non-allowable wastewater through the De Diego Pump Station to Condado Beach and the Atlantic Ocean.

### San Juan's Unpermitted Discharges of Non-Storm Water through the Stop 18 Pump Station

127.    A portion of San Juan's MS4 conveys flow into the Stop 18 Pump Station.

128.    San Juan's flow to the Stop 18 Pump Station is then discharged without treatment for pollutants to a channel that flows into the Martín Peña Channel; bar screens in the pump stations remove large debris and solids only to reduce the risk of damage to the pumps; sorbent booms in the pump stations remove some floatables and sheens when properly operated and maintained.

129.    The August 2008 Sampling Inspection established the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in a portion of San Juan's MS4 conveying flow to the Stop 18 Pump Station.

130.   The March 2011 Sampling Event established the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharges from the Stop 18 Pump Station.

131.   The May 2012 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Stop 18 Pump Station.

132.   The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Stop 18 Pump Station.

133.   The discharge channel or outfall of the Stop 18 Pump Station is a "point source" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), because it is a discernible, confined and discrete conveyance from which pollutants are or may be discharged.

134.   Based on sampling and inspections, San Juan has discharged non-allowable wastewater through the Stop 18 Pump Station to the Martín Peña Channel.

### San Juan's Failure to Implement SWMP in Violation of its Permit

135.   The MS4 General Permit Section 4 requires the permittee to submit a Storm Water Management Program/Plan ("SWMP") which must include, among other things, the practices and techniques the permittee will use to comply with permit conditions, as well as measurable goals and dates on which required actions will be completed.

136.   San Juan submitted its initial SWMP to EPA in March 2008.

137.   Because the initial SWMP was inadequate, EPA requested that San Juan submit a revised SWMP.

138.    San Juan submitted a revised SWMP in June 2011 and partial re-revised SWMPs in March 2012 and June 2012.

139.    The MS4 General Permit at Section 5.3 requires the permittee to submit annual reports indicating the permittee's progress toward reaching the measurable goals and milestones set out in its SWMP.

140.    San Juan submitted annual reports to EPA in November of 2008, 2009, 2010, 2011, 2012, and 2013.

141.    Section 4.1.2 of the MS4 General Permit requires each regulated small MS4 to fully implement its SWMP by November 6, 2011.

142.    Section 4.2.3.1.2 of the MS4 General Permit requires San Juan to "[d]evelop, if not already completed, a storm sewer system map, showing the location of all outfalls and the names and location of all waters of the United States that receive discharges from those outfalls."

143.    In its SWMP submitted to EPA on March 7, 2008, at Section 5.1.3.11, San Juan stated that it would complete the storm sewer system map in Year 2.

144.    In its 2009 annual report at page 14, San Juan stated that "it is expected that the [storm sewer system] map will be completed by the end of 2010."

145.    In its 2010 annual report at page 18, San Juan stated that "[t]he MS4-1 brigade is still identifying and locating infrastructure and providing data to the San Juan Dept. of Planning and Land Use for inclusion in the MS4 map."

146.    In its 2011 annual report, San Juan stated that the municipality was continuing to inspect its infrastructure for mapping purposes and had hired a geographic data management company in order to "speed up the data collection process."

147. In its 2011 revised SWMP, San Juan stated that it "has begun a comprehensive infrastructure map of the MS4. Once completed, this map will aid the municipality in targeting outfalls with dry weather flows and other suspicious discharges . . . and will help coordinate management activities to remove illicit connections . . . ."

148. In its June 2012 revised SWMP, San Juan again stated that it "has begun" the map but would not finish mapping all areas of its MS4 until November 2015.

149. In its 2013 annual report, San Juan modified its mapping objectives and anticipates that it will complete a portion of its map by September 2014.

150. Based upon its annual reports and SWMPs, San Juan has never completed a storm sewer system map showing the location of all outfalls and the names and location of all waters of the United States that receive discharges from those outfalls as required by MS4 General Permit Section 4.2.3.1.2.

151. Based upon EPA inspections of San Juan's storm drains and storm water outfalls, San Juan's existing maps of its storm water collection system are incomplete and inaccurate.

152. Without a complete and accurate storm sewer system map, San Juan will not be able to identify the source and location of illicit discharges of sanitary sewage into its MS4, or identify MS4 outfalls that are discharging storm water contaminated with sanitary sewage into waters of the United States.

153. Section 4.2.3.1.1 of the MS4 General Permit (Illicit Discharge Detection and Elimination ("IDDE")), as part of the requirement to develop and fully implement a SWMP by November 6, 2011, requires San Juan to "[d]evelop, implement and enforce a program to detect and eliminate illicit discharges (as defined in 40 CFR § 122.26(b)(2))."

154.    Section 4.2.3.2.4 of the MS4 General Permit requires the IDDE portion of the SWMP to "include dry weather field screening for non-storm water flows and field tests of selected chemical parameters as indicators of discharge sources."

155.    San Juan's annual reports prior to the June 2012 did not include the results of field testing or other sampling of any kind.

156.    In its June 2012 SWMP, San Juan stated that sampling in order to determine the source of dry weather flows would commence at the start of Fiscal Year 2012, or July 1, 2012.

157.    On information and belief, San Juan has failed to develop a complete and accurate map of its MS4 system.

158.    San Juan's failure to develop a complete and accurate map of its MS4 and its failure to implement a plan for dry weather field screening by November 6, 2011 constitute a failure to develop and fully implement its SWMP by the deadline established in the permit.

159.    Because San Juan has failed to fully implement a SWMP meeting all requirements of its permit by November 6, 2011, San Juan is in violation of the MS4 General Permit.

*DNER's Unpermitted Discharges from the Baldorioty de Castro Pump Station*

160.    DNER owns and operates the Baldorioty de Castro Pump Station, located adjacent to the Baldorioty de Castro Expressway in San Juan, Puerto Rico.

161.    DNER discharges flow entering the Baldorioty de Castro Pump Station into the Los Corozos Lagoon without treatment for pollutants; bar screens in the pump stations remove large debris and solids only to reduce the risk of damage to the pumps; sorbent booms in the pump stations remove some floatables and sheens when properly operated and maintained.

162.   The August 2008 Sampling Inspection established the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in influent entering the Baldorioty de Castro Pump Station.

163.   The March 2011 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the Baldorioty de Castro Pump Station.

164.   The May 2012 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Baldorioty de Castro Pump Station.

165.   The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Baldorioty de Castro Pump Station.

166.   The discharge channel or outfall of the Baldorioty de Castro Pump Station is a "point source" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), because it is a discernable, confined and discrete conveyance from which pollutants are or may be discharged.

167.   Based on sampling and inspections, DNER has discharged raw sewage from the Baldorioty de Castro Pump Station to waters of the United States.

### DNER's Unpermitted Discharges from the De Diego Pump Station

168.   DNER owns and operates the De Diego Pump Station, located on De Diego Avenue, just north of the Baldorioty de Castro Expressway in Santurce, Puerto Rico.

169.   DNER discharges flow entering the De Diego Pump Station into the Condado Beach which flows to the Atlantic Ocean without treatment for pollutants; bar screens in the

pump stations remove large debris and solids only to reduce the risk of damage to the pumps; sorbent booms in the pump stations remove some floatables and sheens when properly operated and maintained.

170.   The August 2008 Sampling Inspection established the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in influent entering the De Diego Pump Station.

171.   The March 2011 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the De Diego Pump Station.

172.   The May 2012 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the De Diego Pump Station.

173.   The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the De Diego Pump Station.

174.   The discharge pipe or outfall of the De Diego Pump Station is a "point source" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), because it is a discernible, confined and discrete conveyance from which pollutants are or may be discharged.

175.   Based on sampling and inspections, DNER has discharged raw sewage from the De Diego Pump Station to waters of the United States.

### *DNER's Unpermitted Discharges from the Stop 18 Pump Station*

176.   DNER owns and operates the Stop 18 Pump Station, located on Villamil Street in Santurce, Puerto Rico.

177.   DNER discharges flow entering the Stop 18 Pump Station into the Martín Peña Channel without treatment for pollutants; bar screens in the pump stations remove large debris and solids only to reduce the risk of damage to the pumps; sorbent booms in the pump stations remove some floatables and sheens when properly operated and maintained.

178.   The August 2008 Sampling Inspection confirmed the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in influent entering the Stop 18 Pump Station.

179.   The March 2011 Sampling Event detected the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the Stop 18 Pump Station.

180.   The May 2012 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the Stop 18 Pump Station.

181.   The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the Stop 18 Pump Station.

182.   The discharge pipe or outfall of the Stop 18 Pump Station is a "point source" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), because it is a discernable, confined and discrete conveyance from which pollutants are or may be discharged.

183.   Based on sampling and inspections, DNER has discharged raw sewage from the Stop 18 Pump Station to waters of the United States.

*DTPW's Unpermitted Discharges of Non-Storm Water*
*from the Vacuum Sewer System*

184.    DTPW, acting either on its own behalf or through its subsidiary agency the

Highway and Transportation Authority, designed and constructed an Vacuum Sewer System to

service certain areas in the Barrio Obrero Marina community within the municipality of San

Juan, including residences located along Argentina Street.

185.    A Vacuum Sewer System is designed to convey sanitary and other wastewaters,

under negative pressure and through pipes ranging between 4 and 6 inches in diameter, from the

source of the wastewater to a wastewater treatment facility.

186.    Some of the pipes comprising the Vacuum Sewer System cross storm sewer

pipelines of San Juan's MS4, thereby obstructing the flow of storm water in San Juan's MS4 and

rendering that system more susceptible to blockages and delaying efforts to clean and maintain

the San Juan MS4.

187.    A reconnaissance inspection conducted jointly by EPA and San Juan on

September 5, 2012 identified a broken Vacuum Sewer System pipe on Argentina Street that,

because it crosses San Juan's MS4, discharges wastewater directly into the San Juan MS4.

188.    EPA and San Juan also identified other Vacuum Sewer System pipes on

Argentina Street that cross San Juan's MS4.

189.    Based on inspections, DTPW has discharged non-allowable wastewater from the

broken Vacuum Sewer System pipe to flow through the San Juan MS4 and into the Martín Peña

Channel at the end of Argentina Street.

### *DTPW's Unpermitted Discharges of Non-Storm Water through the Baldorioty de Castro Pump Station*

190.    A portion of DTPW's MS4 conveys flow into the DNER Baldorioty de Castro Pump Station.

191.    Investigations indicate that the box sewer that contributes flows to the Baldorioty de Castro wet well was designed and built by DTPW's predecessor agency, the Department of Public Works.

192.    Influent to the Baldorioty de Castro Pump Station is discharged without treatment for pollutants to the Los Corozos Lagoon.

193.    The August 2008 Sampling Inspection established the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in pipes flowing into the Baldorioty de Castro Pump Station.

194.    The March 2011 Sampling Event detected the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Baldorioty de Castro Pump Station.

195.    The May 2012 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the Baldorioty de Castro Pump Station.

196.    The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing out of the Baldorioty de Castro Pump Station.

197.    The discharge channel or outfall of the Baldorioty de Castro Pump Station is a "point source" within the meaning of Section 502(14) of the Act, 33 U.S.C. § 1362(14), because

it is a discernable, confined and discrete conveyance from which pollutants are or may be discharged.

198.    Based on sampling and inspections, DTPW has discharged non-allowable wastewater through the Baldorioty de Castro Pump Station to waters of the United States, including the Los Corozos Lagoon.

### DTPW's Unpermitted Discharges of Non-Storm Water through the De Diego Pump Station

199.    A portion of DTPW's MS4 conveys flow into the DNER De Diego Pump Station.

200.    Influent to the De Diego Pump Station is discharged without treatment for pollutants to Condado Beach where it flows into the Atlantic Ocean.

201.    The August 2008 Sampling Inspection established the presence of pollutants, including raw sewage, within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in pipes flowing into the De Diego Pump Station.

202.    The March 2011 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing from the De Diego Pump Station.

203.    The May 2012 Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the De Diego Pump Station.

204.    The December 2012 DNER Sampling Event confirmed the presence of pollutants within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), in the discharge flowing through the De Diego Pump Station.

205.    Reconnaissance Inspections conducted by EPA on July 11, 2013 and on September 24, 2013 identified a DTPW MS4 storm sewer located along De Diego Avenue that also contributes dry weather flows to the De Diego Pump Station.

206.    Based on sampling and inspections, DTPW has discharged non-allowable wastewater through the De Diego Pump Station to the Atlantic Ocean.

### *DTPW's Unpermitted Discharges*

207.    Under Section 1.5.1 of the MS4 General Permit, all regulated small MS4s must submit a notice of intent to be covered under the permit, or to apply for an individual permit by February 5, 2007.

208.    DTPW submitted its notice of intent to have discharges from its MS4 covered under the MS4 General Permit on November 4, 2011.

### *Defendants' Imminent and Substantial Endangerment of Health or Welfare*

209.    San Juan owns and operates an MS4 including but not limited to the Barrio Obrero and Buena Vista Pump Stations.

210.    San Juan's MS4 conveys large volumes of water, including water contaminated with raw sewage, via San Juan's Barrio Obrero and Buena Vista Pump Station outfalls and other outfalls, into the Martín Peña Channel and also into the Rio Piedras River, and the Puerto Nuevo Channel.

211.    San Juan's MS4 conveys large volumes of water, including water contaminated with raw sewage into portions of the Rio Piedras River watershed, including but not limited to, the Buena Vista Creek, the Del Ausubo Creek, Doña Ana Creek and the Puerto Nuevo Channel, and ultimately into San Juan Bay.

212.  San Juan's MS4 conveys large volumes of water, including water contaminated with raw sewage, into DNER's Stop 18, Baldorioty, and De Diego Pump Stations.

213.  DNER conveys large volumes of water, including water contaminated with raw sewage, via DNER's Stop 18 Pump Station, into the Martín Peña Channel.

214.  DNER conveys large volumes of water, including water contaminated with raw sewage, via DNER's Baldorioty Pump Station, into the Los Corozos Lagoon.

215.  DNER conveys large volumes of water, including water contaminated with raw sewage, via DNER's De Diego Pump Station, onto Condado Beach, where it flows into the Atlantic Ocean.

216.  DTPW conveys large volumes of water, including water contaminated with raw sewage, via DNER's Stop 18 Pump Station, into the Martín Peña Channel.

217.  DTPW conveys large volumes of water, including water contaminated with raw sewage, via DNER's Baldorioty Pump Station, into the Los Corozos Lagoon.

218.  DTPW conveys large volumes of water, including water contaminated with raw sewage, via DNER's De Diego Pump Station, onto Condado Beach, where it flows into the Atlantic Ocean.

219.  Puerto Rico has classified the Los Corozos Lagoon and the Martín Peña Channel as "Class SB" waters, pursuant to Section 303 of the Act, 33 U.S.C. § 1313.

220.  Class SB waters in Puerto Rico are coastal waters intended for uses such as swimming where the human body comes into prolonged and direct contact with the water, and for use in propagation and preservation of desirable species.

221.    San Juan Bay, surrounded by a highly urbanized area, is used extensively for commercial and recreational activities and is used for the propagation and preservation of desirable species.

222.    Condado Beach is used for fishing, boating, swimming, surfing and other recreational activities.

223.    Los Corozos Lagoon is used for fishing, boating, swimming, and other recreational activities.

224.    Martín Peña Channel is used for fishing, boating, swimming, and other recreational activities.

225.    Fishing, boating, swimming, and otherwise recreating in water contaminated with raw sewage can cause exposure to bacteria, viruses, parasitic organisms, intestinal worms and boroughs (inhaled molds and fungi).  The diseases these may cause in humans range in severity from mild gastroenteritis (causing stomach cramps and diarrhea) to life-threatening ailments such as cholera, dysentery, infectious hepatitis, and severe gastroenteritis.  Groups facing greater risks include children, the elderly, immuno-compromised groups, and pregnant women.

226.    Exposure to untreated sewage, therefore, presents an "imminent and substantial endangerment to the health of persons or to the welfare of persons where such endangerment is to the livelihood of such persons, such as inability to market shellfish," who come into contact with it as provided in Section 504 of the Act, 33 U.S.C. § 1364.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### *San Juan's Non-Storm Water Discharges - Section 301 of the Act*

227.  Paragraphs 1 through 226 are realleged and incorporated herein.

228.  San Juan's MS4 General Permit imposes the following conditions:

**1.3    Limitations on coverage**

The following storm water discharges are not authorized by this permit:

1.3.1   Discharges that are mixed with sources of non-storm water unless such non-storm water discharges are:
    – In compliance with a separate NPDES permit, or
    – Determined not to be a substantial contributor of pollutants to waters of the U.S.

Ex. 1, MS4 General Permit at ¶ 1.3

229.    San Juan has discharged pollutants from its MS4, including, but not limited to the Barrio Obrero Pump Station, Buena Vista Pump Station, the Calle 10 and Calle 13 outfalls, outfalls located within the 2012 San José Lagoon/Rio Piedras River Study Area, and storm sewers tributary to the Baldorioty de Castro, Stop 18, and De Diego Pump Stations.

230.    These discharges by San Juan are not in compliance with the MS4 General Permit because they are discharges of non-storm water and have not been determined not to be a substantial contributor of pollutants to waters of the United States.

231.    These discharges by San Juan are not in compliance with any other NPDES permit.

232.    By discharging non-storm water that has not been determined not to be a substantial contributor of pollutants to waters of the United States from its MS4, San Juan is in violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

233.    Pursuant to Section 309(b) and (d) of the Act, 33 U.S.C. § 1319(b) and (d), San Juan is liable for civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 and $37,500 per day for each violation occurring after January 12, 2009.

234.    Upon information and belief, San Juan will continue to discharge non-storm water from its MS4 and into the waters of the United States in violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Pursuant to Section 309(b) of the Act 33 U.S.C. § 1319(b), the Administrator is entitled to seek injunctive relief to secure the Defendant San Juan's compliance with the Act.

## SECOND CLAIM FOR RELIEF

### *San Juan's Failure to Develop and Implement Complete SWMP by November 6, 2011*
### *Permit Violations - Section 402 of the Act*

235.    Paragraphs 1 through 226 are realleged and incorporated herein.

236.    The MS4 General Permit requires San Juan to "develop and fully implement" a SWMP meeting all permit requirements by November 6, 2011.

237.    Each failure by San Juan to comply with the requirement to develop and fully implement a SWMP as described in Section 4 of the MS4 General Permit has been a daily violation of the permit from November 6, 2011 to present.

238.    Unless enjoined by an order of the Court, San Juan will continue to violate the requirement to develop and fully implement a SWMP consistent with Section 4 of the MS4 General Permit.

239.    Pursuant to Section 309(b) and (d) of the Act, 33 U.S.C. § 1319(b) and (d), San Juan is liable for civil penalties of up to $37,500 per day for each violation.

## THIRD CLAIM FOR RELIEF

### *DNER's Unpermitted Discharges – Section 301 of the Act*

240.    Paragraphs 1 through 226 are realleged and incorporated herein.

241.    DNER has discharged storm water mixed with sanitary sewage into waters of the United States from the Baldorioty de Castro Pump Station, the De Diego Pump Station, and the Stop 18 Pump Station.

242.    The discharges of storm water mixed with sanitary sewage from the Baldorioty de Castro, De Diego, and Stop 18 Pump Stations are discharges of pollutants within the meaning of Section 502(12) of the Act, 33 U.S.C. § 1362(12).

243.    Each of the discharges of storm water mixed with sanitary sewage from the Baldorioty de Castro, De Diego, and Stop 18 Pump Stations without a permit is a violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

244.    Pursuant to Section 309(b) and (d) of the Act, 33 U.S.C. § 1319(b) and (d), DNER is liable for civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 and $37,500 per day for each violation occurring after January 12, 2009.

245.    Upon information and belief, DNER will continue to discharge pollutants from its pump stations into the waters of the United States in violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a). Pursuant to Section 309(b) of the Act 33 U.S.C. § 1319(b), the Administrator is entitled to seek injunctive relief to secure DNER's compliance with the Act.

## FOURTH CLAIM FOR RELIEF

### *DTPW's Non-Storm Water Discharges - Section 301 of the Act*

246.    Paragraphs 1 through 226 are realleged and incorporated herein.

247.    DTPW's MS4 General Permit imposes the following conditions,

36

1.3    **Limitations on coverage**

The following storm water discharges are not authorized by this permit:

1.3.1    Discharges that are mixed with sources of non-storm water unless such non-storm water discharges are:
— In compliance with a separate NPDES permit, or
— Determined not to be a substantial contributor of pollutants to waters of the U.S.

Ex. 1, MS4 General Permit at ¶ 1.3The following storm water discharges

248.    DTPW has discharged non-allowable pollutants from its MS4, including, but not limited to its Vacuum Sewer System and the storm sewers tributary to the Baldorioty de Castro, Stop 18, and De Diego Pump Stations.

249.    These discharges by DTPW are not in compliance with the MS4 General Permit because they are discharges of non-storm water and have not been determined not to be a substantial contributor of pollutants to waters of the United States.

250.    These discharges by DTPW are not in compliance any other NPDES permit.

251.    By discharging non-storm water that has not been determined not to be a substantial contributor of pollutants to waters of the United States from its MS4, DTPW is in violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).

252.    Pursuant to Section 309(b) and (d) of the Act, 33 U.S.C. § 1319(b) and (d), San Juan is liable for civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 and $37,500 per day for each violation occurring after January 12, 2009.

253.    Upon information and belief, DTPW will continue to discharge non-storm water from its MS4 and into the waters of the United States in violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  Pursuant to Section 309(b) of the Act 33 U.S.C. § 1319(b), the

Administrator is entitled to seek injunctive relief to secure the Defendant DTPW's compliance with the Act.

## FIFTH CLAIM FOR RELIEF

### *DTPW's Unpermitted Discharges*

254.    Paragraphs 1 through 226 are realleged and incorporated herein.

255.    Under Section 1.5.1 of the MS4 General Permit, all regulated small MS4s, including DTPW, were required to submit a notice of intent to be covered under the permit, or to apply for an individual permit by February 5, 2007.

256.    DTPW submitted its notice of intent to have discharges from its MS4 covered under the MS4 General Permit on November 4, 2011.

257.    Each discharge of pollutants by DTWP into navigable waters of the United States until submission of its notice of intent to be covered under the MS4 General Permit constitutes a separate violation of Section 301 of the Act, 33 U.S.C. § 1318.

258.    Pursuant to Section 309(b) and (d) of the Act, 33 U.S.C. § 1319(b) and (d), San Juan is liable for civil penalties of up to $32,500 per day for each violation occurring after March 15, 2004 and $37,500 per day for each violation occurring after January 12, 2009.

## SIXTH CLAIM FOR RELIEF

### *Defendants' Imminent and Substantial Endangerment – Section 504(a) of the Act*

259.    Paragraphs 1 through 226 are realleged and incorporated herein.

260.    Section 504(a) of the Act, 33 U.S.C. § 1364(a) states:

Emergency Powers.

Notwithstanding any other provision of this chapter, the Administrator upon receipt of evidence that a pollution source or combination of sources is presenting an imminent and substantial endangerment to the health of persons or to the welfare of persons where such endangerment is to the livelihood of such persons, such as inability to

market shellfish, may bring suit on behalf of the United States in the appropriate district court to immediately restrain any person causing or contributing to the alleged pollution to stop the discharge of pollutants causing or contributing to such pollution or to take such other action as may be necessary.

261.    San Juan has discharged raw sewage, including but not limited to fecal coliform, total coliform, enterococci and other "pollutants" within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), from its MS4, including but not limited to the Barrio Obrero Pump Station and Buena Vista Pump Stations, which discharge effluent to the Martín Peña Channel, and ultimately to the San Juan Bay.

262.    San Juan has discharged raw sewage, including but not limited to fecal coliform, total coliform, enterococci and other "pollutants" within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), from its MS4 into DNER's Stop 18, Baldorioty, and De Diego Pump Stations.

263.    DNER has discharged raw sewage, including but not limited to fecal coliform, total coliform, enterococci and other "pollutants" within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362 (6), from its Stop 18 Pump Station, which discharges effluent to the Martín Peña Channel, and ultimately to the San Juan Bay.

264.    DNER has discharged raw sewage, including but not limited to fecal coliform, total coliform, enterococci and other "pollutants" within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), from its Baldorioty Pump Station, which discharges effluent to the Los Corozos Lagoon.

265.    DNER has discharged raw sewage, including but not limited to fecal coliform, total coliform, enterococci and other "pollutants" within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), from its De Diego Pump Station, which discharges effluent onto Condado Beach, where it flows into the Atlantic Ocean.

266.    DTPW has discharged raw sewage, including but not limited to fecal coliform, total coliform, enterococci and other "pollutants" within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), from its MS4, portions of which discharge effluent to the Martín Peña Channel, and ultimately to the San Juan Bay.

267.    DTPW has discharged raw sewage, including but not limited to fecal coliform, total coliform, enterococci and other "pollutants" within the meaning of Section 502(6) of the Act, 33 U.S.C. § 1362(6), from its MS4 into DNER's Stop 18, Baldorioty, and De Diego Pump Stations.

268.    Untreated sewage is "pollution" as that term is defined in Section 502(19) of the Act, 33 U.S.C. § 1362(19).

269.    Defendant San Juan's Barrio Obrero Pump Station, including its outfall or discharge point, is a "pollution source" within the meaning of Section 504(a).

270.    Defendant San Juan's Buena Vista Pump Station, including its outfall or discharge point, is a "pollution source" within the meaning of Section 504(a).

271.    Defendant DNER's Baldorioty de Castro, De Diego, and Stop 18 Pump Stations, including their outfalls and discharge points, are a "pollution source" or a "combination of sources" within the meaning of Section 504(a).

272.    Defendant DTPW's Vacuum Sewer System, including its outfalls and discharge points, are a "pollution source" or a "combination of sources" within the meaning of Section 504(a).

273.    Untreated sewage may carry bacteria, viruses, parasitic organisms, intestinal worms and boroughs (inhaled molds and fungi).  The diseases these may cause range in severity

from mild gastroenteritis (causing stomach cramps and diarrhea) to life-threatening ailments such as cholera, dysentery, infectious hepatitis, and severe gastroenteritis.

274.    Because the Atlantic Ocean at Condado Beach, the Los Corozos Lagoon, San Juan Bay, and the Martín Peña Channel are all used for fishing, boating, swimming, wading and/or other recreational and commercial activities, and because San Juan Bay is used for the propagation and preservation of desirable species, these pollution sources or combination of sources present an imminent and substantial endangerment to the health of persons or to the welfare of persons where such endangerment is to the livelihood of such persons.

275.    Pursuant to Section 504(a), 33 U.S.C. § 1364(a), the United States seeks an order enjoining San Juan to: (a) take measures to prevent, minimize, or mitigate, to the greatest extent possible, the discharge of sewage from its MS4 into the Martín Peña Channel and the discharge of sewage from its MS4 into any other waters of the United States; (b) develop a comprehensive illicit discharge detection and elimination program that includes a response plan to follow when discharges of sewage occur from San Juan's MS4; (c) improve public outreach and communications to notify the public about the risks associated with contacting sewage, and how to contact San Juan in the event of a sewage discharge; (d) take other actions as may be necessary to abate and mitigate discharges of sewage from San Juan's MS4; and (e) fully comply with its MS4 Permit.

276.    Pursuant to Section 504(a), 33 U.S.C. § 1364(a), the United States seeks an order enjoining DNER to take actions as may be necessary to abate the endangerment resulting from discharges of sewage from its Baldorioty de Castro, Stop 18, and De Diego Pump Stations including, for instance, disinfection, floatables controls, conveying sewage to sanitary systems with capacity, communications to notify the public about the risks associated with contacting

sewage, and restrictions on commercial and recreational uses of the waters receiving contaminated discharges from these stations.

277.    Pursuant to Section 504(a), 33 U.S.C. § 1364(a), the United States seeks an order enjoining DTPW to: (a) take measures to prevent, minimize, or mitigate, to the greatest extent possible, the discharge of sewage from its MS4 into the Martín Peña Channel and the discharge of sewage from its MS4 into any other waters of the United States; (b) develop a comprehensive illicit discharge detection and elimination program that includes a response plan to follow when discharges of sewage occur from DTPW's MS4; (c) take other actions as may be necessary to abate and mitigate discharges of sewage from DTPW's MS4; and (d) fully comply with its MS4 Permit.

278.    On information and belief, Defendants San Juan, DNER and DTPW will continue to discharge pollutants into the waters of the United States unless enjoined by the Court. Pursuant to Section 504(a) of the Act 33 U.S.C. § 1364(a), the Administrator is entitled to seek injunctive relief to secure the Defendants' compliance with the Act.

## RELIEF SOUGHT

WHEREFORE, Plaintiff United States of America respectfully requests that the Court grant the following relief:

1.    Order that San Juan be assessed, pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), civil penalties of up to $32,500 per day for each violation of its MS4 General Permit, occurring after March 15, 2004 and up to $37,500 per day for each violation occurring after January 12, 2009.

2.      Order that San Juan be permanently enjoined, pursuant to Section 504(a), of the Act, 33 U.S.C. § 1364(a), from discharging pollutants except as authorized by permit under Section 402 of the Act, 33 U.S.C. § 1342.

3.      Order that San Juan, pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b), undertake a program and develop a schedule to achieve permanent and consistent compliance with the Clean Water Act and regulations promulgated thereunder throughout its MS4.

4.      Order that DNER, as an instrumentality of Puerto Rico, pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), be assessed civil penalties of up to $32,500 per day for each violation of Section 301 of the Act, 33 U.S.C. § 1311 occurring after March 15, 2004 and up to $37,500 per day for each violation occurring after January 12, 2009.

5.      Order that DNER, as an instrumentality of Puerto Rico, be permanently enjoined, pursuant to Section 504(a) of the Act, 33 U.S.C. § 1364(a), from discharging pollutants except as authorized by permit under Section 402 of the Act, 33 U.S.C. §1342.

6.      Order that DNER, as an instrumentality of Puerto Rico, pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b), undertake a program and develop a schedule to achieve permanent and consistent compliance with the Clean Water Act and regulations promulgated thereunder at the Baldorioty, De Diego, and Stop 18 Pump Stations.

7.      Order that DNER, as an instrumentality of Puerto Rico, pursuant to Section 309(b) of the Act, 33 U.S.C.  § 1319(b), study its other pump stations for the presence of pollutants and provide the study results to EPA.

8.      Order that DTPW, as an instrumentality of Puerto Rico, pursuant to Section 309(d) of the Act, 33 U.S.C. § 1319(d), be assessed civil penalties of up to $32,500 per day for

each violation of Section 301 of the Act, 33 U.S.C. § 1311 occurring after March 15, 2004 and up to $37,500 per day for each violation occurring after January 12, 2009.

9.      Order that DTPW, as an instrumentality of Puerto Rico, be permanently enjoined, pursuant to Section 504(a) of the Act, 33 U.S.C. § 1364(a), from discharging pollutants except as authorized by permit under Section 402 of the Act, 33 U.S.C. §1342.

10.      Order that DTPW, as an instrumentality of Puerto Rico, pursuant to Section 309(b) of the Act, 33 U.S.C. § 1319(b), undertake a program and develop a schedule to achieve permanent and consistent compliance with the Clean Water Act and regulations promulgated thereunder.

11.      Order that DNER and/or DTPW, as instrumentalities of Puerto Rico, and/or San Juan be ordered to reimburse the United States for the costs and disbursements of this action.

12.      Order such other relief as the Court deems just and proper.

Respectfully submitted,

SAM HIRSCH
Acting Assistant Attorney General
Environment and Natural Resources Division

Date: 6/16/2014

KEITH T. TASHIMA
Senior Attorney
Environmental Enforcement Section
Environment and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611
Ben Franklin Station
Washington, D.C.  20044-7611
(202) 616-9643
keith.tashima@usdoj.gov

ROSA E. RODRIGUEZ-VELEZ
United States Attorney
District of Puerto Rico

44

HECTOR E. RAMIREZ
Assistant United States Attorney
District of Puerto Rico   USDC No. 214902
Federal Office Building, Suite 1201
350 Carlos E. Chardón Avenue
San Juan, Puerto Rico 00918
hector.e.ramirez@usdoj.gov

Of Counsel:

KIM M. KRAMER
EDUARDO J. GONZALEZ
Assistant Regional Counsel
Office of Regional Counsel
United States Environmental Protection Agency
290 Broadway-16th Floor
New York, NY 10007
kramer.kim@epa.gov
gonzalez.eduardoj@epa.gov


ALAN MORRISSEY
Senior Attorney
Office of Civil Enforcement
Water Enforcement Division
United States Environmental Protection Agency
1200 Pennsylvania Avenue, NW
Washington, DC 20460
morrissey.alan@epa.gov